DYK, Circuit Judge, with whom LINN, Circuit Judge,
joins, concurring.
While I fully join the majority opinion, I write separately to respond to the claim in the two dissents that the majority’s opinion is not grounded in the statute, but rather “usurps the legislative role.”[1] In fact, the unpatentability of processes not involving manufactures, machines, or compositions of matter has been firmly embedded in the statute since the time of the Patent Act of 1793, ch. 11, 1 Stat. 318 (1793). It is our dissenting colleagues who would legislate by expanding patentable subject matter far beyond what is allowed by the statute.
I
Section 101 now provides:
Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.
35 U.S.C. § 101 (emphases added).
The current version of § 101 can be traced back to the Patent Act of 1793. In relevant part, the 1793 Act stated that a patent may be granted to any person or persons who:
shall allege that he or they have invented any new and useful art, machine, manufacture or composition of matter, or any new and useful improvement on any art, machine, manufacture or composition of matter....
1 Stat. 318, 319 § 1 (1793) (emphases added). The criteria for patentability established by the 1793 Act remained essentially unchanged until 1952, when Congress amended § 101 by replacing the word “art” with “process” and providing in § 100(b) a definition of the term “process.” The Supreme Court has made clear that this change did not alter the substantive understanding of the statute; it did not broaden the scope of patentable subject matter.[2] Thus, our interpretation of § 101 *967 must begin with a consideration of what the drafters of the early patent statutes understood the patentability standard to require in 1793. See Diehr, 450 U.S. at 182-83, 101 S.Ct. 1048 (looking to the 1793 Act).
A
The patentability criteria of the 1793 Act were to a significant extent the same in the 1790 Act.[3] The 1790 “statute was largely based on and incorporated” features of the English system and reveals a sophisticated knowledge of the English patent law and practice.[4] This is reflected in Senate committee report[5] for the bill that became the 1790 Act, which expressly noted the drafters’ reliance on the English practice:
The Bill depending before the House of Representatives for the Promotion of useful Arts is framed according to the Course of Practice in the English Patent Office except in two Instances—
22 J. Pat. Off. Soc’y at 363 (emphasis added).[6] Likewise, the legislative history of the 1793 Patent Act reflects the same keen understanding of English patent practice. During a debate in the House over the creation of a Patent Office, for example, the Representative who introduced the bill noted that its principles were “an imitation of the Patent System of Great Britain.” 3 Annals of Congress 855 (1793).[7]
*968 Later, Justice Story, writing for the Supreme Court, recognized the profound influence of the English practice on these early patent laws, which in many respects codified the common law:
It is obvious to the careful inquirer, that many of the provisions of our patent act are derived from the principles and practice which have prevailed in the construction of that of England .... The language of [the patent clause of the Statute of Monopolies] is not, as we shall presently see, identical with ours; but the construction of it adopted by the English courts, and the principles and practice which have long regulated the grants of their patents, as they must have been known and are tacitly referred to in some of the provisions of our own statute, afford materials to illustrate it.
Pennock v. Dialogue, 27 U.S. 1, 18, 2 Pet. 1, 7 L.Ed. 327 (1829) (emphases added); see also Graham v. John Deere Co., 383 U.S. 1, 5, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) (noting that first patent statute was written against the “backdrop” of English monopoly practices); Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 230 n. 6, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964) (“Much American patent law derives from English patent law.”).
While Congress departed from the English practice in certain limited respects, in many respects Congress simply adopted the English practice without change. Both the 1790 and the 1793 Acts, for example, adopted the same 14-year patent term as in England. Both also required inventors to file a written specification' — a requirement recognized by the English common law courts in the mid-eighteenth century.[8] In addition, as discussed below, the categories of patentable subject matter closely tracked the English approach, and in certain respects reflected a deliberate choice between competing views prevalent in England at the time.
B
The English practice in 1793, imported into the American statutes, explicitly recognized a limit on patentable subject matter. As the Supreme Court recounted in Ghraham v. John Deere, the English concern about limiting the allowable scope of patents arose from an aversion to the odious Crown practice of granting patents on particular types of businesses to court favorites. 383 U.S. 1, 5, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); see also MacLeod, supra n. 8 at 15 (“But most offensive of all was the granting of monopoly powers in established industries, as a form of patronage, to courtiers whom the crown could not otherwise afford to reward.”). Parliament responded to the Crown’s abuses in 1623 by passing the Statute of Monopolies, prohibiting the Crown from granting these despised industry-type monopolies. Not all monopolies were prohibited, however: the Statute expressly exempted invention-type patent monopolies. Section 6 of the Statute exempted from its prohibitions “letters patent and grants of privilege for the term of fourteen years or under, hereafter to be made, of the sole working or making of any manner of new manufactures within this realm, to the true and first inventor and inventors of such manufactures. ...” 21 Jac. 1. c.3, s.6 (emphases added).
Each of the five categories of patentable subject matter recognized by the 1793 Patent Act — (1) “manufacture,” (2) “machine,” (3) “composition of matter,” (4) “any new and useful improvement,” and (5) “art”— *969 was drawn either from the Statute of Monopolies and the common law refinement of its interpretation or resolved competing views being debated in England at the time. See To Promote the Progress, supra n. 4 at 239.
“Manufacture.” At the most basic level, the 1793 Act, like the Statute of Monopolies, expressly provided for the patentability of “manufactures.” This language was not accidental, but rather reflected a conscious adoption of that term as it was used in the English practice. Id. (“It is clear that the Congress sought to incorporate into the U.S. statutory scheme in 1793 at least as much of the common law interpretation of ‘new manufactures’ as was understood at the time.”).
“Machine.” Likewise, the category of “machines” in the 1793 Act had long been understood to be within the term “manufactures” as used in the English statute. See id.; see, e.g., Morris v. Bramson, 1 Carp. P.C. 30, 31 (K.B.1776) (sustaining a patent “for an engine or machine on which is fixed a set of working needles ... for the making of eyelet-holes”) (emphasis added); MacLeod, supra n. 8 at 101 (noting, among numerous other early machine patents, seven patents on “machinery to raise coal and ores” before 1750).
“Composition of Matter.” Although the 1790 statute did not explicitly include “compositions of matter,” this was remedied in the 1793 statute. At the time, “compositions of matter” were already understood to be a type of manufacture patentable under the English statute. See To Promote the Progress, supra n. 4, at 224 n. 4. One example is found in Liardet v. Johnson, 1 Carp. P.C. 35 (K.B.1778), a ease involving a patent on a “composition” of stucco (a composition of matter). Lord Mansfield’s jury instructions noted that by the time of that trial he had decided “several cases” involving compositions: “But if ... the specification of the composition gives no proportions, there is an end of his patent.... I have determined, [in] several cases here, the specification must state, where there is a composition, the proportions....”[9]
“Any new and useful improvement.” The reference to “any new and useful improvement” in the 1793 Act also adopted a consensus recently reached by the English courts. The common law courts had first ruled in Bircot’s Case in the early seventeenth century that an improvement to an existing machine could not be the proper subject of a patent under the Statute of Monopolies. See Boulton v. Bull, 2 H. Bl. 463, 488 (C.P.1795). In 1776 that line of cases was overruled in Morris v. Bramson, because such a reading of the statute “would go to repeal almost every patent that was ever granted.”[10]
“Art.” As the Supreme Court has recognized, a process “was considered a form of ‘art’ as that term was used in the 1793 Act.” Diehr, 450 U.S. at 182, 101 S.Ct. 1048 (citing Corning v. Burden, 56 U.S. at 267-268). The language of the Statute of Monopolies permitted patents on that which could be characterized as the “working or making of any manner of new manufactures within this realm.” 21 Jac. 1. c.3, s.6. While this language plainly applied to tangible “new manufactures” (such as machines or compositions of matter), it *970 also appeared to allow patenting of manufacturing processes as the “working or making of any manner of new manufactures.” Thus, under the Statute of Monopolies patents could be had on the “working or making of any manner of new manufactures.” Numerous method patents had issued by 1793, including James Watt’s famous 1769 patent on a “[mjethod of diminishing the consumption of fuel in [steam]-engines.”[11] However, the English courts in the mid-eighteenth century had not yet resolved whether processes for manufacturing were themselves patentable under the statute, and as discussed below, the issue was being actively litigated in the English courts. In the 1793 Act Congress resolved this question by including the term “art” in the statute, adopting the practice of the English law officers and the views of those in England who favored process patents.
II
The question remains as to what processes were considered to be patentable in England at the time of the 1793 Act. Examination of the relevant sources leads to the conclusion that the method Bilski seeks to claim would not have been considered patentable subject matter as a process under the English statute.
A
First, the language of the Statute of Monopolies — “working or making of any manner of new manufactures ” — suggests that only processes that related to “manufactures” (including machines or compositions of matter) could be patented.
Second, the English patent practice before and contemporaneous with the 1793 Act confirms the notion that patentable subject matter was limited by the term “manufacture” in the Statute of Monopolies and required a relation to the other categories of patentable subject matter. The organization of human activity was not within its bounds. Rather, the patents registered in England under the Statute of Monopolies before 1793 were limited to articles of manufacture, machines for manufacturing, compositions of matter, and related processes. A complete list of such patents (with a few missing patents from the 17th century) was published in the mid-1800s by Bennet Woodcroft, the first head of the English Patent Office.[12] Representative examples of patented processes at the time include: “Method of making a more easy and perfect division in stocking frame-work manufactures,” No. 1417 to John Webb (1784); “Making and preparing potashes and pearl-ashes of materials not before used for the purpose,” No. 1223 to Richard Shannon (1779); “Making salt from sea-water or brine, by steam,” No. 1006 to Daniel Scott (1772); “Milling raw hides and skins so as to be equally good for leather as if tanned,” No. 893 to George Merchant (1768); “Making salt, and removing the corrosive nature of the same, by a separate preparation of the brine,” No. 416 to George Campbell (1717); and “Making good and merchantable tough iron ... with one-fifth of the expense of charcoal as now used,” No. 113 to Sir Phillibert Vernatt (1637).
Nothing in Woodcroft’s list suggests that any of these hundreds of patents was on a method for organizing human activity, save for one aberrational patent discussed *971 below. Rather, the established practice reflects the understanding that only processes related to manufacturing or “manufactures” were within the statute. The English cases before 1793 recognized that the practice followed in issuing patents was directly relevant to the construction of the statute. See, e.g., Morris, 1 Carp. P.C. at 34 (declining to read the statute in such a way that “would go to repeal almost every patent that was ever granted”).
Third, nearly contemporaneous English cases following shortly after the 1793 Act lend further insight into what processes were thought to be patentable under the English practice at the time the statute was enacted. Although the issue of the validity of process patents had not conclusively been settled in the English common law before 1793, the question was brought before the courts in the landmark case of Boulton v. Bull, 2 H. Bl. 463, 465 (C.P. 1795), which involved James Watt’s patent for a “method of lessening the consumption of steam, and consequently fuel in [steam] engines.”[13] In 1795, the court rendered a split decision, with two judges on each side. Boulton, 2 H. Bl. at 463 (1795). Those who viewed process patents as invalid, as did Justice Buller, urged that a method was merely an unpatentable principle: “A patent must be for some new production from [elements of nature], and not for the elements themselves.” Id. at 485. He thought “it impossible to support a patent for a method only, without having carried it into effect and produced some new substance.” Id. at 486. Justice Health similarly found that the “new invented method for lessening the consumption of steam and fuel in [steam] engines” (i.e., the Watt patent), being neither “machinery” nor a “substance[ ] (such as medicine[ ]) formed by chemical and other processes,” was not within the Statute of Monopolies. Id. at 481-82. In contrast, Lord Chief Justice Eyres, who believed processes had long been a valid subject of patents, urged that “two-thirds, I believe I might say three-fourths, of all patents granted since the statute [of Monopolies] passed, are for methods of operating and of manufacturing ....” Id. at 494-95 (emphasis added). He agreed that “[undoubtedly there can be no patent for a mere principle; but for a principle so far embodied and connected with corporeal substances ... I think there may be a patent.” Id. at 495 (emphasis added). Justice Rooke also noted that Watt’s method was within the statute because it was connected with machinery: ‘What method can there be of saving steam or fuel in engines, but by some variation in the construction of them?” Id. at 478. The Justices who believed process patents were valid spoke in terms of manufacturing, machines, and compositions of matter, because the processes they believed fell within the statute were processes that “embodied and connected with corporeal substances.” Id. at 495.
In 1799, on appeal from another case involving the same Watt patent, the validity of such process patents were upheld. Hornblower v. Boulton (K.B.1799), 8 T.R. 95. There, Chief Justice Lord Kenyon stated that “it evidently appears that the patentee claims a monopoly for an engine or machine, composed of material parts, which are to produce the effect described; and that the mode of producing this is so described, as to enable mechanics to produce it.... I have no doubt in saying, that this is a patent for a manufacture, which I *972 understand to be something made by the hands of man.” Id. at 99. Justice Grose agreed, finding that “Mr. Watt had invented a method of lessening the consumption of steam and fuel in [steam] engines”, and this was “not a patent for a mere principle, but for the working and making of a new manufacture within the words and meaning of the statute.” Id. at 101-02. He further noted, however, that “This method ... if not effected or accompanied by a manufacture, I should hardly consider as within the [statute].” Id. at 102-03 (emphasis added). Justice Lawrence similarly found such process patents to be permissible: “Engine and method mean the same thing, and may be the subject of a patent. ‘Method,’ properly speaking, is only placing several things and performing several operations in the most convenient order. ...” Id. at 106.
There is no suggestion in any of this early consideration of process patents that processes for organizing human activity were or ever had been patentable. Rather, the uniform assumption was that the only processes that were patentable were processes for using or creating manufactures, machines, and compositions of matter.
B
The dissenters here, by implication at least, appear to assume that this consistent English practice should somehow be ignored in interpreting the current statute because of technological change.[14] There are several responses to this.
The first of these is that the Supreme Court has made clear that when Congress intends to codify existing law, as was the case with the 1793 statute, the law must be interpreted in light of the practice at the time of codification. In Schmuck v. United States, 489 U.S. 705, 718-19, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989), for example, the Court considered the proper interpretation of Rule 31(c) of the Federal Rules of Criminal Procedure. The rule, “which ha[d] not been amended since its adoption in 1944,” was a restatement of an 1872 Act “codif[ying] the common law for federal criminal trials.” Because of this fact, the Court found that the “prevailing practice at the time of the Rule’s promulgation informs our understanding of its terms.” Id.; see also, e.g., Eldred v. Ashcroft, 537 U.S. 186, 200 n. 5, 123 S.Ct. 769, 154 L.Ed.2d 683 (2003) (considering the English practice at the time of the enactment of the 1790 copyright act); Tome v. United States, 513 U.S. 150, 159-60, 166, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995) (looking to practice and noting that “a majority of common-law courts were performing [a task required by the common law] for well over a century” in interpreting a Federal Rule of Evidence that “was intended to carry over the common-law”); Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 549-554, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) (relying on the history and practice of copyright fair-use when statutory provision reflected the “intent of Congress to codify the common-law doctrine”); Sprague v. Ticonic Nat’l Bank, 307 U.S. 161, 164-65, 59 S.Ct. 777, 83 L.Ed. 1184 (1939) (considering the English practice “which theretofore had been evolved in the English Court of Chancery” at the time of the 1789 Judiciary Act in *973 determining availability of costs under equity jurisdiction).
Second, the Supreme Court language upon which the dissents rely[15] offers no warrant for rewriting the 1793 Act. To be sure, Congress intended the courts to have some latitude in interpreting § 101 to cover emerging technologies, Chakrabarty, 447 U.S. at 316, 100 S.Ct. 2204, and the categorical terms chosen are sufficiently broad to encompass a wide range of new technologies. But there is no evidence that Congress intended to confer upon the courts latitude to extend the categories of patentable subject matter in a significant way. To the contrary, the Supreme Court made clear that “Congress has performed its constitutional role in defining patentable subject matter in § 101; we perform ours in construing the language Congress has employed. In so doing, our obligation is to take statutes as we find them, guided, if ambiguity appears, by the legislative history and statutory purpose.” Id. at 315, 100 S.Ct. 2204. In Benson, the Court rejected the argument that its decision would “freeze process patents to old technologies, leaving no room for the revelations of the new, onrushing technology.” Gottschalk v. Benson, 409 U.S. 63, 71, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972). Instead, the Court explained that it “may be that the patent laws should be extended to cover [such onrushing technology], a policy matter to which we are not competent to speak” but that “considered action by the Congress is needed.” Id. at 72-73, 93 S.Ct. 253.
Third, we are not dealing here with a type of subject matter unknown in 1793. One commentator has noted:
The absence of business method patents cannot be explained by an absence of entrepreneurial creativity in Great Britain during the century before the American Revolution. On the contrary, 1720 is widely hailed as the beginning of a new era in English public finance and the beginning of major innovations in business organization.
Malla Pollack, The Multiple Unconstitutionality of Business Method Patents, 28 Rutgers Computer & Tech. L.J. 61, 96 (2002) (footnotes omitted).[16] In the hundreds of patents in Woodcroft’s exhaustive list of English patents granted from 1612 to 1793, there appears to be only a single patent akin to the type of method Bilski seeks to claim. That sole exception was a patent granted to John Knox in 1778 on a “Plan for assurances on lives of persons from 10 to 80 years of age.”[17] Later commentators have viewed this single patent as clearly contrary to the Statute of Monopolies:
Such protection of an idea should be impossible.... It is difficult to understand how Knox’s plan for insuring lives could be regarded as ‘a new manner of manufacture’; perhaps the Law Officer was in a very good humour that day, or perhaps he had forgotten the wording of the statute; most likely he was concerned only with the promised ‘very considerable Consumption of [Revenue] *974 Stamps’ which, Knox declared, would ‘contribute to the increase of the Public Revenues.’
Renn, supra n. 16 at 285. There is no indication that Knox’s patent was ever enforced or its validity tested, or that this example led to other patents or efforts to patent similar activities. But the existence of the Knox patent suggests that as of 1793 the potential advantage of patenting such activities was well-understood.
In short, the need to accommodate technological change in no way suggests that the judiciary is charged with rewriting the statute to include methods for organizing human activity that do not involve manufactures, machines, or compositions of matter.
C
Since the 1793 statute was reenacted in 1952, it is finally important also to inquire whether between 1793 and 1952 the U.S. Patent Office and the courts in this country had departed from the English practice and allowed patents such as those sought by Bilski. In fact, the U.S. Patent Office operating under the 1793 Act hewed closely to the original understanding of the statute. As in the English practice of the time, there is no evidence that patents were granted under the 1793 Act on methods of organizing human activity not involving manufactures, machines or the creation of compositions of matter. The amicus briefs have addressed the early American practice, and some of them claim that human activity patents were allowed in the early period. To the contrary, the patents cited in the briefs are plainly distinguishable.
The earliest claimed human activity patent cited in the briefs issued in 1840, entitled “Improvement in the Mathematical Operation of Drawing Lottery-Schemes.” Br. of Amicus Curiae Regulatory Datacorp 23 n.54. But that patent is fundamentally unlike the Bilski claim, since it does not claim a method of organizing human activity not involving manufactures, machines or the creation of compositions of matter. See U.S. Patent No. 1700 (issued July 18, 1840). Rather, it is directed to a scheme of combining different combinations of numbers onto a large number of physical lottery tickets (i.e., a method for manufacturing lottery tickets). Id. col.l. The other early-issued patents cited in the amicus briefs are similarly distinguishable.[18]
Likewise, Supreme Court decisions before the 1952 Patent Act assumed that the only processes that were patentable were those involving other types of patentable subject matter. In later cases the Supreme Court has recognized that these cases set forth the standard for process *975 patents in the pre-1952 period. Diehr, 450 U.S. at 182-84, 101 S.Ct. 1048; Gottschalk, 409 U.S. at 69-70, 93 S.Ct. 253. The leading case is Corning v. Burden, 56 U.S. 252, 15 How. 252, 14 L.Ed. 683 (1853). There, the Supreme Court discussed the patentability of processes:
A process, eo nomine, is not made the subject of a patent in our act of Congress. It is included under the general term ‘useful art.’ An art may require one or more processes or machines in order to produce a certain result or manufacture. The term machine includes every mechanical device or combination of mechanical powers and devices to perform some function and produce a certain effect or result. But where the result or effect is produced by chemical action, by the operation or application of some element or power of nature, or of one substance to another, such modes, methods, or operations, are called ‘processes.’ A new process is usually the result of discovery; a machine, of invention. The arts of tanning, dyeing, making water-proof cloth, vulcanizing India rubber, smelting ores, and numerous others are usually carried on by processes, as distinguished from machines.... It is for the discovery or invention of some practicable method or means of producing a beneficial result or effect that a patent is granted, and not for the result or effect itself. It is when the term process is used to represent the means or method of producing a result that it is patentable, and it will include all methods or means which are not effected by mechanism or mechanical combinations.
Id. at 267-68 (emphases added). In Coch-rane v. Deener, the Court clarified its understanding of a patentable “process”:
That a process may be patentable, irrespective of the particular form of the instrumentalities used, cannot be disputed. ... A process is a mode of treatment of certain materials to produce a given result. It is an act, or a series of acts, performed upon the subject-matter to be transformed and reduced to a different state or thing. If new and useful, it is just as patentable as is a piece of machinery. In the language of the patent law, it is an art. The machinery pointed out as suitable to perform the process may or may not be new or patentable; whilst the process itself may be altogether new, and produce an entirely new result. The process requires that certain things should be done with certain substances, and in a certain order; but the tools to be used in doing this may be of secondary consequence.
94 U.S. 780, 787-88, 24 L.Ed. 139 (1876) (emphases added). Finally, in Tilghman v. Proctor, 102 U.S. 707, 722, 26 L.Ed. 279 (1880), the Court noted:
That a patent can be granted for a process there can be no doubt. The patent law is not confined to new machines and new compositions of matter, but extends to any new and useful art or manufacture. A manufacturing process is clearly an art, within the meaning of the law.
(Emphasis added). The Court’s definition of a patentable process was well-accepted and consistently applied by the courts of appeals. See, e.g., P.E. Sharpless Co. v. Crawford Farms, 287 F. 655, 658-59 (2nd Cir.1923); Chicago Sugar-Refining Co. v. Charles Pope Glucose Co., 84 F. 977, 982 (7th Cir.1898).
Finally, nothing in the legislative history of the 1952 Act suggests that Congress intended to enlarge the category of patentable subject matter to include patents such as the method Bilski attempts to claim. As discussed above, the only change made by the 1952 Act was in replacing the word *976 “art” with the word “process.” The Supreme Court has already concluded that this change did not alter the substantive understanding of the statute. See Diehr, 450 U.S. at 182, 101 S.Ct. 1048 (“[A] process has historically enjoyed patent protection because it was considered a form of ‘art’ as that term was used in the 1793 Act.”).
The House Report accompanying the 1952 bill includes the now-famous reference to “anything under the sun made by man”:
A person may have “invented” a machine or a manufacture, which may include anything under the sun made by man, but it is not necessarily patentable under section 101 unless the conditions of the title are fulfilled.
H.R.1923 at 7. Although this passage has been used by our court in past cases to justify a broad interpretation of patentable subject matter, I agree with Judge Mayer that, when read in context, the statement undercuts the notion that Congress intended to expand the scope of § 101. See Mayer, J., dissenting op. at 1000. It refers to things “made by man,” not to methods of organizing human activity. In this respect, the language is reminiscent of the 1799 use of the phrase “something made by the hands of man” by Chief Justice Lord Kenyon as a limitation on patentable subject matter under the Statute of Monopolies. The idea that an invention must be “made by man” was used to distinguish “a philosophical principle only, neither organized or capable of being organized” from a patentable manufacture. Hornblower, 8 T.R. at 98. Lord Kenyon held that the patent before him was not based on a mere principle, but was rather “a patent for a manufacture, which I understand to be something made by the hands of man.” Id. at 98 (emphases added); accord American Fruit Growers v. Brog-dex Co., 283 U.S. 1, 11, 51 S.Ct. 328, 75 L.Ed. 801 (1931) (giving “anything made for use from raw or prepared materials” as one definition of “manufacture”).
In short, the history of § 101 fully supports the majority’s holding that Bilski’s claim does not recite patentable subject matter. Our decision does not reflect “legislative” work, but rather careful and respectful adherence to the Congressional purpose.

. The dissents fault the majority for "ven-tur[ing] away from the statute,” Rader, J., dissenting op. at 1013, and ''usurping] the legislative role,” Newman, J., dissenting op. at 997.

. See Diamond v. Diehr, 450 U.S. 175, 182, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981) ("[A] process has historically enjoyed patent protection because it was considered a form of ‘art’ as that term was used in the 1793 Act.”); *967 Diamond v. Chakrabarty, 447 U.S. 303, 309, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980). Rather, the 1952 Act simply affirmed the prior judicial understanding, as set forth in Corning v. Burden, 56 U.S. (15 How.) 252, 14 L.Ed. 683 (1853), that Congress in 1793 had provided for the patentability of a "process” under the term "art.” Diehr, 450 U.S. at 182, 101 S.Ct. 1048.

. In relevant part, the 1790 Act permitted patents upon "any useful art, manufacture, engine, machine, or device, or any improvement therein not before known or used.” Ch. 11, § 1,1 Stat. 109, 110 (1790).

. Edward C. Walterscheid, To Promote the Progress of Useful Arts: American Patent Law & Administration, 1798-1836 109 (1998) (hereinafter To Promote the Progress); see also Edward C. Walterscheid, The Early Evolution of the United States Patent Law: Antecedents (Part 1), 76 J. Pat. & Trademark Off. Soc’y 697, 698 (1994) (”[T]he English common law relating to patents was what was best known in the infant United States.”).

. Senate Committee Report Accompanying Proposed Amendments to H.R. 41, reprinted in Proceedings in Congress During the Years 1789 & 1790 Relating to the First Patent & Copyright Laws, 22 J. Pat. Off. Soc’y 352, 363 (1940).

. Neither of those two instances related to patentable subject matter or was adopted in the enacted statute. The first proposed departure from the English practice was a novelty provision protecting the inventor against those who derived their knowledge of the invention from the true inventor; the second was in a requirement that patentees make a "Public Advertisement” of their invention. Such a requirement was thought necessary "in so extensive a Country as the United States.” Senate Report, reprinted in 22 J. Pat. Off. Soc’y at 363-64.
The American statute ultimately differed in some other respects. For example, Congress rejected the English rule that the invention need only be novel in England. The American statute required novelty against the whole world and did not permit "patents of importation.” See To Promote the Progress, supra n. 4 at 95-97, 137-38.

.Even the opposing view — urging departure from the English practice in particular respects — recognized that the English practice provided considerable guidance. See 3 Annals of Congress at 855-56 ("[Great Britain] had' afforded, it was true, much experience on the subject; but regulations adopted there would not exactly comport in all respects either with the situation of this country, or with the rights of the citizen here. The minds of some members had taken a wrong direction, he conceived, from the view in which they had taken up the subject under its analogy with the doctrine of patents in England.”); see also To Promote the Progress, supra n. 4 at 216-17.

. See Christine MacLeod, Inventing the Industrial Revolution: The English Patent System, 1660-1800 48-49 (2002); To Promote the Progress, supra n. 4 at 400, 404.

. Edward C. Walterscheid, The Nature of the Intellectual Property Clause: A Study in Historical Perspective 55 (2002) (quoting E. Wyndham Hulme, On the History of the Patent Laws in the Seventeenth and Eighteenth Centuries, 18 L.Q. Rev. 280, 285 (1902)).

. Morris, 1 Carp. P.C. at 34; see also Boul-ton, 2 H.B1. at 489 ("Since [Morris v. Bram-son ], it has been the generally received opinion in Westminster Hall, that a patent for an addition is good.”).

. Walterscheid, supra n. 9 at 355-56 (emphasis added); see also Boulton, 2 H. Bl. at 494-95 (1795) (noting that many method patents had issued).

. Bennet Woodcroft, Alphabetical Index of Patentees of Inventions, from March 2, 1617 (14 James I) to October 1, 1852 (16 Victoriae) (2d ed. 1857).

. The Supreme Court has in several opinions noted Boulton v. Bull in connection with its consideration of English patent practice. See, e.g., Markman v. Westview Instruments, Inc., 517 U.S. 370, 381 n. 6, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996); Evans v. Eaton, 20 U.S. (7 Wheat.) 356, 388 n. 2-3, 5 L.Ed. 472 (1822).

. See, e.g., Rader, J., dissenting op. at 1011 ("[Tjhis court ties our patent system to dicta from an industrial age decades removed from the bleeding edge.”); id. (”[T]his court ... links patent eligibility to the age of iron and steel at a time of subatomic particles and terabytes....”); Newman, J., dissenting op. at 1011 (”[T]his court now adopts a redefinition of 'process' in Section 101 that excludes forms of information-based and software-implemented inventions arising from new technological capabilities....”).

. See, e.g., Newman, J., dissenting op. at 981 (" '[C]ourts should not read into the patent laws limitations and conditions which the legislature has not expressed.’ ” (quoting Diehr, 450 U.S. at 182, 101 S.Ct. 1048)); Rader, J., dissenting op. at 1012 (same).

. Similarly, another commentator states: “it might be wondered why none of the many ingenious schemes of insurance has ever been protected by patenting it.” D.F. Renn, John Knox’s Plan for Insuring Lives: A Patent of Invention in 1778, 101 J. Inst. Actuaries 285 (1974), available at http://www.actuaries.org. uk/ _data/assets/pdflfile/0006/25278/0285-0289.pdf (last visited Oct 3, 2008).

.Woodcroft, supra n. 12 at 324.

. See, e.g., Complemental Accident Insurance Policy, U.S. Patent No. 389,818 (issued Sept. 18, 1888) (claiming a "complemental insurance policy” as an apparatus consisting of two separate cards secured together); Insurance System, U.S. Patent No. 853,852 (issued May 14, 1907) (claiming a "two-part insurance policy” as "an article of manufacture”).
A number of the amici also refer to the discussion and the patents cited in "A USPTO White Paper” (the "White Paper”) to establish the historical foundation of business method patents. See, e.g., Br. of Amicus Curiae Accenture 14-15 n. 11. As Judge Mayer notes, dissenting op. at 1001-02 n. 4, the White Paper does not show this proposition. As the White Paper itself recognizes, the early financial patents it discusses were largely mechanical products and methods related to financial paper, not methods for organizing human activity. White Paper at 2. Thus, while the White Paper shows that inventions in the business realm of finance and management historically enjoyed patent protection, it does little to establish that business methods directed to the organization of human activity not involving manufactures, machines or the creation of compositions of matter were similarly patentable.